## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEVEN BURKHARDT, individually and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br>v.<br><br>MONEYLION TECHNOLOGIES INC., ML PLUS, LLC, and MONEYLION OF FLORIDA, LLC,<br><br>           Defendants. | **Case No.:** 1:25-cv-06761-DEH-SLC<br>**Rel.:**      [1:25-cv-04098]<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMAND** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Deven Burkhardt ("Plaintiff"), individually, and on behalf of all others similarly situated, and through her own knowledge and upon information and belief of her counsel, bring this First Amended Class Action Complaint against Defendants MoneyLion Technologies Inc. ("MLT"), ML Plus, LLC ("MLP") and MoneyLion of Florida LLC ("MLF") (collectively referred to as "Defendants") and alleges:

## INTRODUCTION

1.      This class action challenges a brazen and calculated scheme by Defendants MLT, MLP and their lending subsidiaries, like MLF, to systematically exploit highly vulnerable military borrowers through unlawful, deceptive and coercive practices designed to extract exorbitant finance charges under the false pretense of offering legitimate loans. For close to a decade, Defendants used this scheme to disguise illegal finance and interest charges as "Turbo Fees," "Tips" and "Monthly Membership Fees," and trap borrowers into a deliberately rigged ecosystem, where access to basic credit is conditioned on payment of astronomical charges that borrowers are required, misled or coerced to pay.

2.      Defendants' predatory scheme violates the Military Lending Act ("MLA"), 10 U.S.C. §§ 987, *et seq*. Congress designed the MLA to protect active duty servicemembers of the United States Armed Forces ("covered members") and their spouses ("dependents") (altogether "covered borrowers").[1] And Congress enacted the MLA following an epidemic of predatory lending that was threatening and endangering military readiness, security clearances and servicemember morale and retention. The MLA was intentionally designed to be the most protective consumer lending statute ever enacted in the United States. Congress made extensive findings about the unique vulnerabilities of servicemembers, their spouses and dependents (covered borrowers), and then created not just another disclosure regime but a statute with teeth that imposes categorical prohibitions that go well beyond ordinary consumer protection law.

3.      The MLA requires that written and oral disclosures of the Military Annual Percentage Rate ("MAPR") be provided before any borrower may be obligated on any loan. Furthermore, under the clear text of the statute, it is unlawful to extend covered "consumer credit" and to charge interest on loans containing prohibited provisions 10 U.S.C. §§ 987(a) and (e).

4.      Defendants trap borrowers through two primary loan products: (1) Instacash loans, advertised as providing instant access to cash for free; and (2) Credit Builder loans, advertised as improving a borrower's credit health.

5.      Defendants roar about "financial empowerment" boasting of free, no-strings-attached loans and credit building opportunities. Both descriptions of Defendants' financial products are false. In reality, Defendants' loan products present a friendly façade to lure in consumers and disguise Defendants' predatory lending operation. Defendants' Instacash loans are

---

[1] 32 C.F.R. 232.3(g).

anything but free. They carry crushing annual percentage rates ("APRs") of 495%, 990%, 2,310% or greater, designed to ensnare consumers in an endless cycle of debt. Defendants' Credit Builder loans are a cruel misnomer. Rather than improving consumers' financial health, Defendants' Credit Builder loans carry finance and interest charges with annual percentage rates that exceed legal limits, erode credit, burden consumers with steep APRs and serve only to enrich the lender.

6.    Borrowers wedged in the debt trap created by Instacash loans, like Plaintiff and the Class, find it nearly impossible to escape. The debt cycles created by the Instacash unlawful loan terms allow Defendants to take Plaintiff's and the Class members' bank accounts as security for the obligation, even where the Defendants' loans exceed 36% MAPR, to extract costly finance charges, resulting in depleted paychecks and borrowers forced to take out new Instacash loans to repay old loans. It is next to impossible to avoid repaying Instacash loans: Defendants require consumers to link their bank accounts to Defendants' proprietary software application where it requires consumers to authorize Defendants the right to automatically debit those linked bank accounts directly after a paycheck is deposited on payday in the consumers' account. This unfettered access deprives borrowers of agency over their bank accounts and allows for Defendants to siphon consumers' bank accounts without regard for whether the consumers actually need their paychecks for a medical emergency, family emergency, vehicle repair, household necessity such as rent, utilities, or groceries, among other things.

7.    Defendants' Credit Builder loans only compound this issue. Credit Builder loans also saddle consumers with additional costly interest and finance charges and harm consumer credit. Consumers cannot avoid paying the Credit Builder loans either: Defendants charge finance charges until Credit Builder loans are repaid and refuse to honor consumers' cancellation requests.

8.      Defendants' treatment of covered borrowers is particularly egregious. Despite federal law prohibiting lenders from charging more than a 36% MAPR, Defendants knowingly extend loans to covered borrowers at interest rates far above 36%. Defendants do so by tacking on so-called "Turbo Fees," "Tips" and "Monthly Membership Fees." Defendants hide the cost of the actual charges by mislabeling the charges, knowing that the charges are "finance charges" and by failing to disclose the cost of credit in terms of an APR, as required by the Truth in Lending Act ("TILA"). On top of that, Defendants are guaranteed that borrowers repay these mislabeled and disguised, illegal charges by requiring Plaintiff and Class members to provide their bank accounts as security for Instacash loans that exceed 36% MAPR and continuing to charge fees until Credit Builder loans are repaid.

9.      The Instacash and Credit Builder loans that Defendants extended to Plaintiff and the Class violate the MLA, which renders those loans *void ab initio*. Defendants' Instacash and Credit Builder loan agreements (the "Agreements") contain a standardized laundry list of MLA violations: (1) the Instacash and Credit Builder loans exceed the MLA's statutory rate cap of 36% MAPR, require mandatory binding arbitration, require consumers to waive their right to participate in a class action, require consumers to waive their right to a jury trial and fail to provide required mandatory MLA written disclosures; and (2) the Instacash loans require consumers to provide their bank account as security for an obligation where the loan exceeds 36% MAPR. *See* **Exhibits A–B**; *see also* 10 U.S.C. § 987(a)(3).

10.      Plaintiff seeks justice for the thousands of covered members and dependents systematically swindled, financially immobilized and trapped by Defendants' predatory lending racket. Defendants violated the MLA and TILA by operating an illegal, fee-based credit scheme. This lawsuit seeks a declaration from the Court that Defendants' loans extended to Plaintiff and

the Class are void, halt the ongoing collection of unlawful debts, recover ill-gotten gains and obtain damages for every covered borrower ensnared in this exploitative web. What Defendants market as financial empowerment is in truth a calculated strategy to strip vulnerable individuals—especially covered borrowers—of their rights, their money and their dignity.

11.    Since Defendants' loans violate the MLA, the loan Agreements extended by Defendants to Plaintiff (and the Class members) are void from inception under 10 U.S.C. § 987(f)(3) as though they never existed.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this matter pursuant to 10 U.S.C. § 987(f)(5)(E) and 28 U.S.C. § 1331.

13.    The Court also has jurisdiction under 28 U.S.C. § 1332(d), the Class Action Fairness Act, because this is a proposed class action, on behalf of a Class of over 100 Class members, whose claims aggregate in an amount in controversy that exceeds five million dollars and which includes members whose state citizenship is diverse from that of Defendants.

14.    Plaintiff's payments ultimately flowed to MLT.

15.    This Court possesses personal jurisdiction over Defendants because they deliberately and regularly conducted business, including marketing, distributing, promoting and/or extending consumer credit from the State of New York. The loans at issue are believed to be issued from within this District and for the same reasons, Defendants successfully sought a transfer from where this case was originally filed (Northern District of Florida) to this District.

16.    Venue is proper in this District pursuant to 10 U.S.C. § 987(f)(5)(E) and 28 U.S.C. § 1391, because MLF resides in this District and a substantial part of the events and omissions giving rise to Plaintiff's and the Class's MLA claims that occurred in this District.

17.    Plaintiff has Article III standing because she suffered a concrete injury in that: (1) she is required to "pay interest," and paid interest, on loans which contain terms that are prohibited by the MLA in violation of § 987(a); (2) she is obligated to pay money under Defendants' loans that were void from inception because they contain terms prohibited by § 987(e); (3) Defendants are imposing interest due on Plaintiff's loans which constitutes a requirement to pay interest in violation of § 987(a); and (4) Plaintiff requires declaratory and injunctive relief voiding the loans at issue, and precluding enforcement of the Defendants' MLA-violative interest rates and removing her and the Class's bank accounts as security for the obligation of these illegal loans.

## PARTIES

### I.    Plaintiff Deven Burkhardt

18.    Plaintiff Deven Burkhardt is a natural person and is currently a citizen of Georgia, residing in Richmond County, Georgia.[2]

19.    At all times relevant hereto, Plaintiff was married to, and the spouse of, Staff Sergeant ("SSG") Johnathan Burkhardt. SSG Burkhardt is currently serving on active duty in the 7th Group Special Forces in the United States Armed Forces.

20.    At all times material hereto, SSG Burkhardt was a "covered member" as defined by the MLA, 10 U.S.C. § 987(i)(1)(A), because he was on active duty in the United States Armed Forces.

21.    SSG Burkhardt served eleven (11) years in the United States Armed Forces and currently maintains a security clearance.

---

[2] When the original complaint was filed, Plaintiff was a citizen of Florida, residing in Okaloosa County, Florida.

22.     At all times material hereto, Plaintiff Deven Burkhardt was a "dependent" of a "covered member" as defined by the MLA, 10 U.S.C. § 987(i)(2), as the spouse of SSG Burkhardt.

## II.    <u>Defendants</u>

23.     Defendants are each "creditors" that extended "consumer credit" to Plaintiff as those terms are defined in 10 U.S.C. § 987(i)(6) and 32 C.F.R. §§ 232.3(h) & (i).

24.     Defendant MoneyLion Technologies Inc. f/k/a MoneyLion Inc. is a Delaware Corporation headquartered in New York. Through its digital-technology platform, including its website and mobile app, MLT offered and brokered online single payment balloon loans and installment loans, engaged in servicing and collections of such loans and provided other financial products and services to consumers as described in more detail below. MLT is the direct corporate parent of the MoneyLion lending subsidiaries MLF and MLP. MLT managed, directed, controlled and staffed the MLF lending, servicing and collections operations. MLT similarly managed, directed, controlled and staffed MLP's membership-program operations and its servicing and collections of membership fees, and MLT provided all transactional and payment services for those operations. MLT is a "creditor" of the Plaintiff's and the Class members' loans.

25.     Defendant MLP is a Delaware limited liability company headquartered in New York. MLP offered and provided membership programs to consumers in connection with the online installment consumer loans offered by MLT and its MoneyLion lending subsidiary, MLF. MLP serviced and collected fees associated with those membership programs. MLP has no employees of its own, relying entirely on MLT for its staffing and management. MLP has one member: Diwakar Choubey located at 249 West 17th Street 4th Floor New York, New York, 10011. MLP is a "creditor" of Plaintiff's and Class members' loans.

26.     MLF is a Delaware Limited Liability Company with its principal place of business in New York. MLF has two members: (1) MoneyLion Technologies Inc., located at 249 West 17th Street, 4th Floor New York, New York 10011; and (2) Adam VanWagner located at 249 West 17th Street 4th Floor New York, New York, 10011. MLF is a "creditor" of Plaintiff's and Class members' loans.

27.     Defendants are each "creditors" under the MLA because, during the Class Period, each of those Defendants—by itself and with its affiliates—engaged in the business of extending consumer credit, and each Defendant meets the transaction standard for a "creditor" under Regulation Z, 12 C.F.R. Part 1026, with respect to extensions of consumer credit to borrowers covered by the MLA. 32 C.F.R. § 232.3(i)(3). MLT, along with MLP and MLF are "affiliates" under 32 C.F.R. § 232.3(a). MLT "controls" MLP and MLF. And MLP and MLF are each controlled by MLT.

28.     Although separate entities, Defendants engage in uniform and common operations related to the ownership and operation of balloon loans and installment loans and related extensions of consumer credit, and the marketing and sale of such loans, including the Instacash loans and Credit Builder loans at issue here.

29.     Defendants share officers and directors, registered agents and office addresses, including the same President/CEO, secretary, vice president and treasurer.

30.     Moreover, during the Class Period, MLT controlled all of its MLT lending subsidiaries, including MLF, and each of the MLT lending subsidiaries was controlled by MLT.

31.     Accordingly, MLT and all of its lending subsidiaries are "affiliates."

32.     During the Class Period, MLT provided material services to each of its lending subsidiaries in connection with their origination, extension, servicing and collection of consumer

loans, including providing the capital to the MLT lending subsidiaries for their loan originations; managing and staffing their operations; designing, operating, marketing, maintaining and administering the loans and loan-related programs offered to consumers; setting underwriting guidelines; implementing compliance policies; providing technological platforms through which the loans are marketed, offered and serviced and through which consumers make payments; establishing and processing payments and other transactions relating to the extension and servicing of such loans; establishing accounts used to secure loans and accepting and processing transactions relating to such accounts; and servicing and collecting the loans, including by notifying and contacting consumers by telephonic and electronic means and liquidating and offsetting their accounts.

33.     MLP is controlled by MLT, and MLP is under common control with the MLT lending subsidiaries, including MLF. Accordingly, MLP is an affiliate of MLT and the MLT lending subsidiaries, including MLF. MLP provided material services to MLT and the MLT lending subsidiaries including administering membership programs required in connection with consumer loans; and charging, servicing and collecting membership fees required under such loans, including by notifying and contacting consumers and withdrawing funds from their accounts, including for the Instacash loans and Credit Builder loans at issue here.

## **FACTUAL ALLEGATIONS**

### I.     **The Military Lending Act, 10 U.S.C. §§ 987, *et seq*.**

34.     The United States Congress passed the MLA in 2006. It was enacted to protect covered borrowers and their dependents from unfair or abusive loans, who in the years prior were disproportionate victims of predatory lending.

35.     The MLA directs the Department of Defense ("DoD") to prescribe regulations to carry out the statute.

36.    32 C.F.R. part 232 implements the MLA and contains limitations on, and requirements for, certain types of consumer credit extended to covered borrowers.

37.    Under MLA regulations passed by the DoD, "consumer credit" is defined as: "Credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) Subject to a finance charge; or (ii) Payable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1).

38.    Defendants' Instacash and Credit Builder loans constitute extensions of "consumer credit," as defined under the MLA and 32 C.F.R. § 232.3, because: (1) Plaintiff and the other Class members were "covered members" and/or "dependents"; (2) Plaintiff's loans were primarily for personal, family or household purposes; and (3) Plaintiff's Instacash and Credit Builder loans were subject to either a finance charge and/or were payable in more than four installments.

39.    The MLA places a duty on "creditors" to determine whether a potential borrower is a "covered borrower."

40.    Creditors can use the free MLA database maintained by the DoD to make this determination.

41.    There is nothing in the MLA requiring Plaintiff to identify herself as a "covered borrower."

42.    Defendants made no attempt to determine if Plaintiff was a covered borrower under the MLA.

43.    Defendants routinely and systematically ignore their obligations under the MLA to determine whether an individual is a covered borrower or to comply with the MLA.

44.     Upon information and belief, Defendants use standard form loan agreements for all loans extended during the Class Period, including those Instacash loans and Credit Builder loans extended to covered borrowers like Plaintiff and the Class.

45.     Defendants had both the means and the statutory obligation to verify Plaintiff's covered borrower status through the DoD's MLA database, as required by 32 C.F.R. § 232.5(c). Their failure to do so cannot insulate them from MLA application.

46.     Defendants routinely violate the MLA in a litany of ways: (1) for the Instacash and Credit Builder loans, Defendants' loans exceed the statutory rate cap of 36% MAPR in violation of 10 U.S.C. § 987(b), require mandatory binding arbitration in violation of 10 U.S.C. § 987(e)(3), require consumers to waive their right to participate in a class action in violation of 10 U.S.C. § 987(e)(2), require consumers to waive their right to a jury trial in violation of 10 U.S.C. § 987(e)(2) and fail to provide required mandatory MLA written and oral disclosures in violation of 10 U.S.C. § 987(c); and (2) for the Instacash loans, by requiring borrowers to provide their bank account as security for the obligation where the Defendants' Instacash loans exceed 36% MAPR in violation of 10 U.S.C. § 987(e)(5) and 32 C.F.R. § 232.8(e).

47.     Because of these separate MLA violations, Plaintiff and the putative Class members' loans are void from inception.

48.     Defendants' violations ensured that Plaintiff unknowingly paid interest on a void loan contract, incurred financial obligations she could not legally be required to repay and suffered concrete harms including each time she paid interest on a void loan, diminished credit score and borrowing power and a risk to SSG Burkhardt's security clearance. For covered borrowers like Plaintiff, the presence of such derogatory marks on her credit report and subsequent delinquency poses a direct and significant threat to their active duty spouse's employment status, including the

loss of security clearances and the risk of involuntary separation from service. The harm caused by these omissions is precisely the type of injury the MLA was enacted to prevent.

II.  **A Loan Shark in Your Pocket: The Rise of Digital Payday Apps and the Cycle of Endless Debt**

49.    Payday-loan apps marketed as "Earned Wage Advances" or "Instant Pay" products create a nationwide epidemic of hidden, high-cost debt. Though marketed as innovative financial tools that allow workers to access wages early, these "free" products function as digital payday loans that withdraw repayment automatically from consumers' bank accounts or paychecks. *See* **Exhibit D**.

50.    The Center for Responsible Lending's September 2025 report, *Escalating Debt: The Real Impact of Payday Loan Apps Sold as Earned Wage Advances*, found that these loans carry average APR's of approximately **383 percent**, nearly identical to the 391 percent APR typical of storefront payday loans. *Id.*

51.    These loans are not used primarily for emergencies, as advertised, but to cover basic living expenses such as food, rent and transportation, reflecting chronic income shortfalls rather than isolated crises. Borrowers like Plaintiff turn to these apps repeatedly—not occasionally— demonstrating that the product structure itself perpetuates dependency. *Id.*

52.    Usage escalates rapidly. Within one year of initial borrowing, users doubled their borrowing frequency—from two to four loans per month—and nearly three-quarters (72 percent) took more than one loan within a two-week period. This pattern confirms that re-borrowing is the norm, not the exception. *Id.*

53.    More than half of users (53 percent) obtained loans from multiple apps during the first year of use, a practice known as "stacking." By month twelve, 42 percent of borrowers were

simultaneously indebted to more than one lender, compounding repayment obligations and accelerating overdraft risk. *Id.*

54.     The cumulative effect of repeated borrowing and stacking is crushing. Heavy users paid an average of $421.00 in combined loan and overdraft fees in the first year. This is over six times the cost incurred by light users and triple that of moderate users, leaving borrowers with less take-home pay after every loan cycle. *Id.*

55.     The apps' business models depend on this pattern of repeat use and fee extraction. Companies profit not from helping consumers achieve stability, but from maximizing transaction volume, tip revenue and overdraft exposure, ensuring that financial distress becomes a revenue stream. *Id.*

56.     For military families and other workers living paycheck to paycheck, these loans are especially destructive. Automatic repayment withdrawals collide with rigid military pay schedules that can trigger overdrafts, late-payment fees and damaged credit, placing servicemembers' financial readiness, and even their security clearances, at risk. *Id.*

57.     State and federal regulators recognize these products for what they are: illegal, deceptive and usurious credit schemes disguised as employment benefits. Investigations, such as that of the New York Attorney General, confirm that these lenders mislead borrowers, violate credit laws and exploit financially vulnerable workers. *Id.*

58.     The rise of "Earned Wage Advances" payday-loan apps has thus produced an escalating debt epidemic that drains wages, destabilizes households and undermines economic security nationwide. What is marketed as "financial empowerment" is in truth a modern form of wage garnishment by algorithm—one that feeds on hardship and leaves borrowers perpetually indebted. *Id.*

III.    **Defendants' Instacash Loans**

A.    **Defendants Advertise Instacash Loans as Providing Instant Access to Cash**

59.    Defendants offer consumers a loan product called "MoneyLion Instacash."

60.    This product is advertised as providing instant access to cash to cover "[u]nexpected vet bills, . . . last minute date night[s]," or other unexpected or time-sensitive obligations.



61.    Over the years, this product allowed consumers to obtain between $500.00 to $1000.00 in loans per pay period, but consumers are limited to taking out $100.00 at a time. As explained below, by limiting borrowers to $100.00 at a time, Defendants ensure borrowers pay more fees to obtain Instacash loans. Ultimately, Defendants' $100.00 limit increases charges, requiring consumers to take out five loans or ten loans with five to ten times the fees to get the same advertised $500.00 to $1000.00 loan.

62.    Defendants' Instacash loan product works as follows:

14

**B.    Defendants Charge Fees to Obtain Compensation for Offering Instacash Loans**

63.    To ensure they obtain compensation for offering Instacash loans, Defendants charge a so-called "Turbo Fee" between $0.49 to $8.99 to obtain Instacash loans for their advertised and intended purpose—as an instant source of money. The amount of the fee increases as the size of the loan increases—just like traditional interest.[3]

64.    Consumers who do not pay this fee obtain an inferior version of Defendants' Instacash loans that is not instant at all.

65.    That version of Defendants' product is deposited up to five business days after a loan request is made and cannot be used to obtain "instant" Instacash loans or pay unexpected expenses or time-sensitive obligations. The market for these loans is people who do not want to wait until payday.

_____

[3] Fees are lower if the funds are sent to a so-called "Roar Money" account established through Defendants, though the fees still increase with the size of the loan.

66.    In addition to requiring payment of the "Turbo Fee" to obtain the advertised version of the Instacash loan, Defendants automatically include that charge and lead consumers to believe that they cannot avoid paying the "Turbo Fee."

67.    When consumers obtain an Instacash loan from Defendants, they are shown one of the following two screens:

 

68.    Neither screen states that the "Turbo Fee" is optional.

69.    And the newer screen (on the right) does not even display that charge; instead, the newer screen hides that charge in a "Total amount" dropdown box.

70.    If a consumer fails to click that box to see the hidden fee, they will not even know they are being charge a "Turbo Fee."

71.     And even for a consumer who understands the "Turbo Fee" is avoidable, they are only able to avoid that fee if they obtain an inferior version of the Instacash loan that Defendants advertise—a version that does not provide immediate access to cash.

72.     And even for consumers who choose to obtain this inferior and different credit product, Defendants place roadblocks for the consumer to bypass and avoid paying the "Turbo Fee."

73.     A consumer who seeks to avoid the fee must first figure out how to do so. Even after eliminating that charge, they are presented with additional friction through a screen that pushes them to get the cash immediately:



74.     This screen displays a large, bright, blue/green "Get cash now" button. If a consumer clicks that button, they are charged the fee. If they click the "select another method" button, they can avoid the fee, but they cannot obtain the advertised version of the Instacash loan;

instead, they obtain a different and inferior version of the Instacash loan product, one that does not provide instant access to money and cannot be used to cover surprise expenses.

75. The purpose of the "Turbo Fee" is to obtain compensation for lending money; the charge does not cover the actual cost of any service or serve any other purpose, as it costs little to nothing to advance money to consumers immediately, rather than days later.

76. Because consumers are limited to obtaining $100.00 in loans at a time, even if they qualify to obtain up to $500.00 or $1000.00 for a pay period, consumers end up paying multiple "Turbo Fees" each pay period and even in a given day.

77. In addition to the "Turbo Fee," Defendants ask consumers to pay a "Tip" for each Instacash loan Defendants issue.

78. The so-called "Tip" charge, like the "Turbo Fee," is solely intended to provide compensation to Defendants for lending money.

79. Calling this charge a "Tip" is deceptive because the charge does not go to a delivery driver, a server or an employee trying to make ends meet; instead, this charge is solely intended to provide an additional revenue stream for Defendants. Yet Defendants show pictures of individuals asking for the tips, implicitly planting the idea that the money supports an individual who is providing them a service—reinforcing the commonly understood meaning of "Tip."

80. Similar to the "Turbo Fee," Defendants structure their MoneyLion app to ensure that a sufficient number of users are guilted or coerced into paying the "Tip" charge to ensure Defendants obtain a profit from lending money.

81. Like the "Turbo Fee," the "Tip" charge is preselected for users to pay, as the screens presented in ¶ 67, *supra*, show. The amount that is preselected is based on a percentage of the amount that is advanced to a consumer.

82.     To avoid this charge, consumers must manually change the preselected amount to zero using a drop-down box. If they fail to do so or fail to understand that they are able to do so, consumers are charged the preselected "Tip" amount.

83.     Defendants pre-select a "Tip" charge with the intent to anchor consumers to the initial amount they see.

84.     To ensure that this "Tip anchor" works, Defendants use a host of deceptive and coercive tactics to get consumers to pay tips.

85.     For example, if consumers refuse to "Tip" while utilizing the MoneyLion app, they are asked to rethink their decision:

 

86.     Further, if the consumer did not include a "Tip" for the prior loan, they are solicited to add the "Tip" before they get a new loan:



87. Thus, Defendants make clear that the "Tip" is expected and implicitly threaten users with restrictions on future use if they do not "Tip." Defendants erected these various roadblocks with the express purpose of ensuring that a sufficient number of consumers pay Defendants' "Tip" charge so Defendants can obtain compensation for lending money.

88. In addition to these tactics, Defendants make explicit claims to consumers that the payment of "Tips" is necessary for Defendants to continue offering Instacash loans, which leads consumers to believe that they must pay "Tips" to ensure continued access.

89. For example:

- Defendants represent that "tips are what help us cover the high costs of administering Instacash at 0% APR for the large and growing MoneyLion community."

- Defendants claim that "it takes money to keep 0% APR Instacash running, so please consider a tip to help keep it free," indicating to consumers that the service <u>will not</u> be "free" if one does not "Tip."

- Defendants suggest that a consumer's "participation" in the payment of the "Tip" charge "will help us ensure that we can keep offering the [Instacash] product."

- Defendants represent that the "Tip" charge "help[s] us cover the high cost of keeping Instacash interest-free and readily available to as many members as possible. We're all in this together."

90.    Defendants continually evaluate their messaging and screens to ensure that their tactics are effective in requiring consumers to pay Defendants' "Tip" charges and "Turbo Fees."

91.    These tactics work, as virtually all borrowers pay the "Turbo Fees," and a large percentage of borrowers pay "Tip" charges.

92.    Despite Defendants' claims that their Instacash loans are "0% APR" and "no interest," these charges are very costly.

93.    For example, a $100.00 Instacash loan with a preselected "Turbo Fee" of $8.99, a preselected "Tip" of $10.00 and a fourteen-day repayment schedule has an APR ***<u>above 495%</u>***. The exact same loan with a seven-day repayment schedule has an APR ***<u>above 990%</u>***. And the same loan with a three-day repayment schedule has an APR ***<u>above 2,310%</u>***.

94.    Because the overwhelming majority of borrowers pay a "Turbo Fee," a "Tip" or both charges to obtain Instacash loans, the average APR for Defendants' Instacash loans is in the triple digits, which far exceeds the MLA's 36% rate cap. *See* **Exhibit A**, p. 10 (finding APRs for

similar cash advance apps average 367%); **Exhibit B**, p. 7 (finding APRs for similar cash advance apps average 334%).

C.    **Instacash Loans Are Structured to Ensure Defendants Obtain Repayment**

95.    Like every lender, Defendants expect to obtain repayment of their loans and the fees they charge.

96.    To ensure repayment occurs, Defendants required Plaintiff and the Class to provide their bank accounts as security for the Instacash loan obligation by way of borrowers linking their bank accounts and payment cards to Defendants' MoneyLion app/website and authorizing Defendants to automatically debit the linked accounts and cards on the borrowers' next scheduled payday in an amount that equals the principal of the borrowers' Instacash loan and the "Turbo Fee" and "Tip" the consumers were charged.

97.    For example, if a consumer obtains a $100.00 Instacash loan and is charged a $8.99 "Turbo Fee" and $10.00 "Tip," they must, as a condition of receiving the loan, authorize Defendants to automatically debit their linked bank account(s) and/or payment card(s) in the amount of $118.99 on their next scheduled payday.

98.    Defendants enforce these automatic debit rights on every loan they issue to obtain repayment and will continue to debit consumers' linked accounts and/or cards until Defendants obtain repayment of the loans and all fees charged.

99.    To ensure that linked bank accounts and payment cards have sufficient money to satisfy their automatic debits, Defendants created a proprietary credit check that borrowers must pass before a loan is issued.

100.    The purpose of this credit check, like any other credit check, is to guard against non-payment.

101.    This credit check requires borrowers to have an employer that pays them regularly (or some other source of recurring income that will appear in the deposit history of their linked bank account) and requires the deposits from their employer (or other source of recurring income) be high enough to satisfy Defendants' automatic debits.

102.    Defendants also analyze spending history and other information to decide what cumulative amount of Instacash loans and fees Defendants will be able to debit on payday.

103.    If Defendants believe they will be unable to obtain repayment of an Instacash loan and related charges, they will not issue a loan at all, or they will limit the size of the loan issued.

104.    After determining that they will be able to obtain repayment of an Instacash loan and related charges, Defendants time their account debits to occur immediately after a borrower's paycheck is deposited into their bank account on payday.

105.    In other words, Defendants are first in line to receive payment from the borrower's paycheck.

106.    The underwriting and collection procedures that Defendants employ are extremely effective at ensuring that Instacash loans, "Turbo Fees," and "Tips" are repaid.

107.    Indeed, Defendants have a near-100% collection rate on non-fraud related Instacash loans. That repayment rate is far higher than a traditional brick and mortar lender.

**D.    Instacash Loans Include Charges That Are Prohibited by the MLA**

108.    Payday lending refers to a short-term, high-cost form of lending, requiring borrowers to repay small dollar loans on their next payday.

109.    This form of lending often traps consumers in reborrowing cycles because the high fees charged on payday loans eat into paychecks, which reduces the amount borrowers receive on payday, requiring them to take out new loans to fill the gap created by old loans.

110.    Trapping consumers in reborrowing cycles is highly profitable for payday lenders (because it enables them to continually harvest payments for expensive charges from a borrower's paycheck), but it does not help improve a consumer's financial health (because their paycheck is repeatedly diminished by expensive charges, which makes it difficult for them to save money or pay for necessities).

111.    This cycle of reborrowing is well documented for cash advance apps like Defendants' MoneyLion app, as various studies show that the typical cash advance app user takes out at least one loan each pay period and continues to borrow even after the first or subsequent loans are repaid. *See* **Exhibit A**, pp. 7-9; **Exhibit B**, p. 7-8.

112.    Recognizing that high-cost loan products create reborrowing cycles that are detrimental to a consumer's financial health, Congress enacted the MLA to protect servicemembers and their dependents to ensure that they would not fall victim to payday lending schemes.

113.    The MLA does so by prohibiting payday lenders from imposing an MAPR of "interest" above 36%. 10 U.S.C. § 987(b).

114.    "Interest" includes "all cost elements associated with the extension of credit, including fees, service charges, . . . and any other charge or premium with respect to the extension of consumer credit." *Id.* § (i)(3).

115.    Defendants' "Turbo Fees" and "Tips" clearly are a cost element associated with the extension of the Instacash loans, as both the "Turbo Fees" and "Tips" are incorporated into a borrower's repayment obligation, increasing the amount of the automatic bank account debit that Defendants receive as a condition of issuing Instacash loans to borrowers.

116.    Indeed, a borrower who receives a $100.00 Instacash loan and does not change the preselected default "Turbo Fee" of $8.99 to $0.00, and does not change the preselected default "Tip" of $10.00 to $0.00, will have $118.99 deducted from their linked bank account on payday.

117.    Since Defendants' charges increase the cost charged to borrowers' accounts for Defendants' Instacash loans, those charges are "interest" under the MLA.

118.    And because those charges routinely exceed the 36% rate allowed by the MLA and, on average, are equivalent to loans with APRs of 495%, 990%, 2,310% or more, those extensions of consumer credit violate the MLA.

**E.    Defendants' Loans Do Not Include the Disclosures Mandated By the Truth In Lending Act or the Military Lending Act**

119.    Congress passed the TILA to ensure "a meaningful disclosure of credit terms" and to avoid "the uninformed use of credit." 15 U.S.C. § 1601(a).

120.    To that end, TILA requires lenders to disclose the cost of credit beforehand, including the disclosure of the cost of credit as a "finance charge," and as an "annual percentage rate" or "APR," depending on the amount of the advance and its cost. *Id.* § 1638.

121.    A "finance charge" includes the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." *Id.* § 1605(a).

122.    Defendants' "Turbo Fees" and "Tips" are "finance charges" as they are payable to the person that is extended credit—Plaintiff and Class members—and they are imposed by Defendants as an incident to the extension of credit.

123.    There is a close connection between Defendants' "Turbo Fees" and "Tips" and Defendants' Instacash loans—and those charges are, therefore, "imposed . . . as an incident to the

extension of credit"—because a borrower's effort to obtain an Instacash loan is what triggers solicitation and payment of a "Turbo Fee" or "Tip."

124.    These charges would not be paid absent the extension of credit, which means they are inextricably intertwined with Defendants' extension of credit to Plaintiff and Class members.

125.    Even though Defendants' "Turbo Fees" and "Tips" qualify as "finance charges," Defendants do not correctly label the charges as such or disclose the cost of the charges as an APR, as TILA requires.

126.    In just the past six months, at least five federal courts considered charges similar to those Defendants receive, and found those charges were "finance charges." *See Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 936–38 (N.D. Cal. 2025); *Vickery v. Empower Fin., Inc.*, No. 25-cv-03675, 2025 U.S. Dist LEXIS 198834, at *15–21 (N.D. Cal. Oct. 7, 2025); *Moss v. Cleo AI Inc.*, No. 25-cv-00879, 2025 U.S. Dist. LEXIS 174845, at *11–13 (W.D. Wash. Sept. 8, 2025); *Golubiewski v. Activehours, Inc.*, No. 22-cv-02078, 2025 U.S. Dist. LEXIS 167308, at *14–19 (M.D. Pa. Aug. 28, 2025); *Johnson v. Activehours, Inc.*, No. 24-cv-02283, 2025 U.S. Dist LEXIS 152809, at *24–27 (D. Md. Aug. 8, 2025).

127.    10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 make mandatory the following disclosures in all extension of consumer credit to Covered Borrowers:

> (a) Required information. With respect to any extension of consumer credit (including any consumer credit originated or extended through the internet) to a covered borrower, a creditor shall provide to the covered borrower the following information before or at the time the borrower becomes obligated on the transaction or establishes an account for the consumer credit:
>
> (1) A statement of the MAPR applicable to the extension of consumer credit;
>
> (2) Any disclosure required by Regulation Z, which shall be provided only in accordance with the requirements of Regulation Z that apply to that disclosure; and

(3) A clear description of the payment obligation of the covered borrower, as applicable. A payment schedule (in the case of closed-end credit) or account-opening disclosure (in the case of open-end credit) provided pursuant to paragraph (a)(2) of this section satisfies this requirement.

[….]

(c) Statement of the MAPR—

(1) In general. A creditor may satisfy the requirement of paragraph (a)(1) of this section by describing the charges the creditor may impose, in accordance with this part and subject to the terms and conditions of the agreement, relating to the consumer credit to calculate the MAPR. Paragraph (a)(1) of this section shall not be construed as requiring a creditor to describe the MAPR as a numerical value or to describe the total dollar amount of all charges in the MAPR that apply to the extension of consumer credit.

(2) Method of providing a statement regarding the MAPR. A creditor may include a statement of the MAPR applicable to the consumer credit in the agreement with the covered borrower involving the consumer credit transaction. Paragraph (c)(1) of this section shall not be construed as requiring a creditor to include a statement of the MAPR applicable to an extension of consumer credit in any advertisement relating to the credit.

(3) Model statement. A statement substantially similar to the following statement may be used for the purpose of paragraph (a)(1) of this section: "Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: The costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account)."

128.    Defendants' standard form Agreements to Plaintiff and the Class do not contain any "Statement of MAPR" either in the form of the charges necessary to calculate the MAPR or through the inclusion of the MLA Model Statement.

129.    Defendants violated the MLA and its implementing regulations by extending consumer credit without any MLA disclosures in violation of 10 U.S.C. § 987(c); 32 C.F.R. §§ 232.6(a) and (c).

130.    Defendants extended Plaintiff's loans through standard form Agreements which were utilized for all Class members, all of which failed to contain any MLA disclosures.

IV.    **Defendants' Credit Builder Loans**

A.    **Defendants Offer Credit Builder Loans to Extract Additional Unlawful Charges from Borrowers**

131.    In addition to offering Instacash loans to consumers, Defendants offer Credit Builder loans to consumers.

132.    Unlike the Instacash loans, which are balloon loans repaid in a single installment on payday, the Credit Builder loans are multiple payment installment loans paid over a period of months.

133.    Defendants impose the "Monthly Membership Fee" on borrowers as a condition of extending a Credit Builder loan.

134.    Initially, Defendants' Credit Builder loan was offered as a 12-month installment loan of $500.00 with a 5.99% APR. As a condition of for getting the Credit Builder loan, Defendants required consumers to enroll in the "ML Plus Membership Program" and pay a $29.00 "Monthly Membership Fee." Only consumers who paid this fee and were current on their monthly fee payments could take out the Credit Builder loan.

135.    Currently, Defendants' Credit Builder loan is offered as a 12-month installment loan between $500.00 and $1,000.00 at APRs between 5.99% and 29.99%. As a condition to receiving the Credit Builder loan, consumers must join the "Credit Builder Plus Membership Program" and must pay "Monthly Membership Fees" of $19.99. Consumers are charged the $19.99 fee each month until they pay their loan in full and pay all monthly charges.

136.    For the current Credit Builder loan, Defendants disburse only a portion of the loan amount at origination and deposit the remainder into a "credit reserve account," which Defendants

release to consumers once consumers pay off the loan and pay all monthly fees charged for each month the loan was active.

137.    If consumers fail to pay a Credit Builder loan or "Monthly Membership Fees", Defendants try to collect the unpaid balance and the unpaid "Monthly Membership Fees."

138.    Consumers with unpaid loan balances or "Monthly Membership Fees" cannot cancel their "Credit Builder Plus Membership Programs"—despite claims in some loan agreements that they can do so.

139.    Similar to the Instacash loans, the Credit Builder loans do not accurately disclose the information TILA requires.

140.    Indeed, although Defendants' Credit Builder loans purport to have APRs between 5.99% and 29.99%, those representations are untrue, as these APR calculations fail to factor in the "Monthly Membership Fee," which is a hidden finance charge that borrowers must pay as a condition to getting the Credit Builder loan and must pay until the loan is paid in full.

141.    When the "Monthly Membership Fee" is properly included in the APR calculation, the actual APR is much higher than the APR Defendants disclose. For example, a $1,000.00 Credit Builder loan with a $169.79 finance charge and a 12-month repayment schedule has an APR of 29.99% without a monthly fee. But once the $19.99 monthly fee for twelve months is included, the actual APR for that loan exceeds 68%.

142.    Defendants never factor in the "Monthly Membership Fees" into their APR calculation, which means Defendants never accurately disclose the APR of their Credit Builder loans, in violation of TILA.

143.    Further, and similar to the "Turbo Fee" and "Tips" charged on Instacash loans, the "Monthly Membership Fees" charged on Credit Builder loans are interest and violate the MLA.

144.    As explained herein, the "Monthly Membership Fees," are finance charges that are charged on Credit Builder loans yield APRs above the MLA's 36% rate cap.

145.    And the "Monthly Membership Fees," qualify as "interest" under the MLA, as they increase the cost of Credit Builder loans, just like "Turbo Fees" and "Tips" increase the cost of Instacash loans.

**B.    Defendants Hide The Nature of Their Unlawful Charges By Offering Sham Membership Plans**

146.    Defendants know their Credit Builder loans violate TILA and the MLA, so Defendants attempt to hide the illegal nature of their loans by claiming that the "Monthly Membership Fee" borrowers must pay as a condition of obtaining Credit Builder loans is not a "finance charge," but rather is a fee paid to access a suite of services, including credit monitoring tools, checking and investment accounts, cashback rewards, increased limits on Instacash loans and various educational tools.

147.    But borrowers can access the suite of services allegedly made accessible through payment of Defendants' "Monthly Membership Fee" *without* actually paying that fee. For example, the credit monitoring tools are available without paying the Monthly Membership Fee or any other fee because that service is "absolutely free and available for all MoneyLion customers."[4] Defendants also offer several cash back programs available to consumers who are not enrolled in Credit Builder.

148.    The checking and investment accounts also can be obtained without paying the Monthly Membership Fee. While Defendants claim that they will "refund" the $1.00/month

---

[4]    *See*    https://www.moneylion.com/free-credit-monitoring?traffic_src=web&medium=secondnav&campaign_id=pricing/

"administrative fee" associated with these accounts for Credit Builder Plus members, that promise is illusory because no such fee applies for consumers who independently signup for the accounts. As shown on MoneyLion's own fee schedule,[5] the administrative fee for a "RoarMoney Banking" account is $0.00 and no administrative fee is listed at all for a MoneyLion Investment account:

### RoarMoney Banking, powered by Pathward®, N.A.

| Fee Type | Amount |
|---|---|
| Monthly administrative fee | $0 |
| ATM withdrawal fee (55,000 in-network ATMs) | $0 |
| ATM withdrawal fee (out of network) | $3 |
| Funding via external debit card fee | 0% |
| Turbo Transfer Fee | 2% |
| Foreign transaction fee | 3% |

### Managed investment account

| Fee Type | Amount | | |
|---|---|---|---|
| | | Account Value | Fee |
| Monthly account fee | | up to $5,000 | $1 |
| | | over $5,000 to $25,000 | $3 |
| | | over $25,000 | $5 |
| Asset-based portfolio management fee | $0 | | |
| Periodic rebalancing fee | $0 | | |
| Trading fees | $0 | | |

---

[5] https://www.moneylion.com/pricing/

149.    The Credit Builder loan is the only product that cannot be accessed without paying Defendants' "Monthly Membership Fee." Accordingly, the only purpose of paying the "Monthly Membership Fee" is to obtain a Credit Builder loan.

150.    Similarly, the only valuable benefit to paying the "Monthly Membership Fee" is obtaining access to the Credit Builder loan. For example, the educational tools offered through payment of that fee are not useful and are found elsewhere, meaning they have little to no value. The cashback rewards also lack value. If anything, these purported benefits harm borrowers, by incentivizing them to spend more money than they can afford—indeed, borrowers seeking to



**Credit Builder Plus membership**

| Fee Type | Amount |
| --- | --- |
| Monthly membership fee | $19.99 |
| Loan principal + APR payment | Principal varies: $500 to $1,000<br>APR varies: 5.99% to 29.99% APR |
| Credit monitoring fee | $0 |
| RoarMoney administrative fee ($1/mo)* | $0<br>(fee is refunded for CB+ members) |
| Investment account administrative fee ($1/mo) | $0<br>(fee is refunded for CB+ members) |

obtain Credit Builder loans lack access to money (which is why they need a loan) and already have poor credit (which is why they have obtained a "Credit Builder" loan). Incentivizing cash strapped individuals to spend money on unnecessary purchases is not a benefit; it is another harmful scam that lines Defendants' pockets to the detriment of its customers. Similarly, increased eligibility limited of "interest-free" Instacash advances is no benefit to consumers but rather, as explained above, directly harms them because these are illegal loans. Finally, as explained herein, credit monitoring is free to all borrowers and borrowers can obtain accounts for checking and

investments without paying the "Monthly Membership Fee." For all of these reasons, the "Monthly Membership Fee" offers only one benefit—access to the Credit Builder loan.

151.    The illusory benefits of the membership program that are accessible by paying the "Monthly Membership Fee" are far different from the real benefits offered by legitimate membership programs. Credit union membership programs offer a good contrasting example because the benefits of such programs actually exist, in the form of lower interest rates on loans, higher returns on deposit accounts and member-ownership. These programs are what TILA's "participation fee" exclusion for "finance charges" contemplates. Those amendments were proposed in 1980, long before fintech predatory lenders, like Defendants, existed. And those amendments exclude charges that provide access to legitimate benefits. They do not exclude charges that provide benefits that do not exist, like those at issue here.

152.    Further, the only reason a borrower would pay the Monthly Membership Fee is to obtain a Credit Builder loan. As explained above, the benefits of paying that fee in addition to the Credit Builder loan are available without paying that fee, So, a borrower that wanted to obtain those benefits, but did not want to obtain the Credit Builder loan, could do so without paying the costly $19.99 Monthly Membership Fee. Therefore, the only reason any reasonable borrower would pay that charge would be to obtain a Credit Builder loan.

153.    In short, the entire "Monthly Membership Fee" is directly connected with eligibility for Credit Builder loans. As a result, the Monthly Membership Fee is a "finance charge" that must be disclosed under TILA and is illegal "interest' under the MLA.

**V.    CFPB Litigation Against Defendants for its Credit Builder Loans**

154.    On September 29, 2022, The Consumer Financial Protection Bureau ("CFPB") filed suit in the Southern District of New York, *CFPB v. MoneyLion Technologies, Inc. et al.*, Case

No.: 1:22-cv-8308 (Hon. John P. Cronan), alleging that Defendants and its other lending subsidiaries violated both the Military Lending Act (MLA) and the Consumer Financial Protection Act (CFPA).

155.    The CFPB alleged that Defendants imposed membership fees (ranging from ~$19.99 to ~$29 monthly) as a condition for access to or continuation of its so-called "low-APR" installment loan or "Credit Builder" programs.

156.    The CFPB further alleged that when those membership fees are aggregated with the stated APRs of the loans, the total MAPR in many instances exceeded the 36% MAPR rate cap mandated by the MLA, thereby rendering the loans void or unenforceable as to covered borrowers.

157.    The CFPB Complaint also alleged that Defendants: (a) prevented or refused cancellation of membership programs while a loan balance remained outstanding, (b) misled borrowers about their ability to cancel, (c) imposed fees even after payoff until past due membership fees were satisfied, and (d) refused borrower requests to stop ACH withdrawals of membership fees even after cancellation.

158.    The CFPB named as defendants not just MoneyLion Technologies, Inc., but also ML Plus, LLC and 37 state-specific MoneyLion lending subsidiaries (e.g. MoneyLion of Florida LLC) in order to capture the various state licensing entities that hold the lending authority in each jurisdiction.

159.    Defendants moved to dismiss the CFPB's Complaint (or thereafter its first amended complaint), challenging among other things: (1) that the CFPB had not alleged that any specific loan exceeded 36% MAPR, (2) that the membership fees did not qualify as "participation fees" under MLA regulations and thus should not be included in MAPR calculations, (3) that the arbitration clauses did not violate the MLA, and (4) that disclosure claims were inadequately pled.

160.    On or by August 18, 2023, the CFPB filed its opposition to Defendants' motion to dismiss the CFPB's First Amended Complaint, urging that the court deny the motion to dismiss because the factual allegations (including the mandatory membership fees and their embedding into the MAPR) adequately pleaded that some loans exceeded the 36% MAPR rate cap.

161.    In a decision reported in March 2025, the SDNY court (Judge Cronan) denied the Defendants' motion to dismiss as to the claim that Defendants' loans exceeded the 36% MAPR cap (*i.e.*, the MLA violation based on inclusion of membership fees). The court held that dismissal of that claim was not warranted at the pleading stage.

162.    As a result, the court carved out and preserved the MLA claim relating to excessive MAPR, holding that the CFPB had plausibly alleged that MoneyLion's loans—including mandatory membership fees—exceeded the 36% MAPR threshold and must proceed to discovery.

163.    Plaintiff and the Class Members' Credit Builder loans are substantially similar to those Credit Builder loans extended to covered borrowers at issue in the CFPB's lawsuit: Plaintiff and the Class are all covered borrowers and their Credit Builder loans also exceed 36% MAPR.

## VI.    Loans To MLA Covered Borrowers

164.    In connection with extensions of consumer credit, the MLA and its implementing regulations contain protections for active duty servicemembers and their dependents ("covered borrowers"). 10 U.S.C. §§ 987(i)(1), (2); 32 C.F.R. § 232.3(g). Those protections include: (1) a maximum allowable amount of all charges that may be associated with an extension of credit, 10 U.S.C. § 987(b); (2) required mandatory MLA written disclosure, 10 U.S.C. § 987(c); and (2) prohibitions against mandatory binding arbitration, class action waiver, jury trial waiver, and requiring borrowers to provide their bank accounts as security for the obligation of loans that exceed the statutory rate cap of 36% MAPR, like the Instacash loans. 10 U.S.C. § 987(e)(2)(3)(5) and 32 C.F.R. § 232.8(e).

165.    Any credit agreement, promissory note or other loan contract with a covered borrower that fails to comply with any provision of the MLA or contains one or more prohibited contract provisions is void from the inception of the contract. 10 U.S.C. § 987(f)(3); 32 C.F.R. § 232.9(c). DoD regulations require newly covered creditors, such as online installment lenders, to bring their operations into compliance with the MLA by October 3, 2016. *See* 32 C.F.R. § 232.12(a).

166.    Since about the fall of 2017, Defendants extended closed-end credit—Instacash and Credit Builder loans—to covered borrowers. All of Defendants' Instacash and Credit Builder loans constitute "consumer credit" under the MLA because they were offered or extended to covered borrowers primarily for personal, family or household purposes and were subject to a finance charge. *See* 32 C.F.R. § 232.3(f)(1)(i).

167.    Defendants required, coerced or misled covered borrowers to pay "Turbo Fees," "Tips" and/or "Monthly Membership Fees" before providing access to these extensions of credit.

## VII.    Plaintiff's Loans

### A.    Instacash Loans

168.    During the Class Period, Defendants extended over 1,000 Instacash loans to Plaintiff Deven Burkhardt, the spouse of SSG Johnathan Burkhardt. Approximately every other week since 2022, Defendants extended Plaintiff loans in amounts of up to $100.00 for each loan, and in cumulative amounts of up to $1,000.00 or more, resulting in Defendants extending dozens of loans to Plaintiff each month.

169.    Even if Plaintiff qualified to receive an aggregate amount of loans above $100.00, Defendants prohibited Plaintiff from accessing more than $100.00 per transaction. For example, if Plaintiff qualified to receive $1,000.00 in a pay period from Defendants, Plaintiff was only

permitted to withdraw $100.00 at a time, essentially requiring her to take out 10 different loans to borrow $1,000.00.

170.    For every $100.00 loan, Defendants required Plaintiff to pay a "Turbo Fee" of roughly $8.99.

171.    In addition to charging that fee, Defendants coerced a "Tip" and pressured Plaintiff to pay that charge for each loan that Plaintiff received. Defendants preselected a "Tip" equivalent to a percentage of every loan Plaintiff requested. Plaintiff paid "Tips" on many of her loan transactions.

172.    This structure caused Plaintiff to pay APRs well above the MLA's 36% rate. For example, Plaintiff obtained a $100.00 loan, paid a $8.99 "Turbo Fee" and a $10.00 "Tip," and repaid the loan, fee and tip in two weeks or less. That is equivalent to paying a loan with an APR of *495% or more*. And because Defendants only allow Plaintiff to obtain $100.00 at a time, Plaintiff took out ten or more loans each pay period, all with APRs of *495% or greater*.

173.    Additionally, Defendants required Plaintiff to provide her bank account as security for the obligation in Defendants' Instacash loans and the Instacash loans exceed a 36% MAPR. Simply put, Defendants control Plaintiff's bank account and control her ability to use her personal bank account freely, so, Defendants get paid before Plaintiff ever pays her rent, groceries or utilities. This level of control, coupled with the Defendants' usurious interest rates on what would normally be an unsecured loan, resulted in Plaintiff being trapped in a reborrowing cycle, where she must take out new loans to fill the gaps that have been created by prior loans.

174.    Defendants extended over one thousand Instacash loans to Plaintiff during the Class Period.

### B.    Credit Builder Loans

175.    In or around 2022, Defendants extended Plaintiff her first Credit Builder loan. The loan was in the amount of $1,000.00, and Plaintiff repaid it after 10 months. The loan ultimately caused Plaintiff's credit score to decrease because of the age of the debt.

176.    In or around 2025, Defendants extended Plaintiff a second Credit Builder loan. The loan was in the amount of $1,000.00 and included a "Finance Charge" of $155.54. Defendants represented that the APR for this loan was 29.69%, but the APR was much higher and far exceeded the MLA's 36% MAPR because Plaintiff was required to pay a "Monthly Membership Fee" of $19.99 as a condition of obtaining the loan. Plaintiff was required to pay this charge for every month the loan was unpaid. Indeed, the actual APR for the Credit Builder loan Plaintiff received is above 36% MAPR.

177.    At the time of the filing of the original Complaint, Plaintiff still owes hundreds of dollars on the Credit Builder loan with interest above the annual interest rate in excess of 36% MAPR.

178.    Plaintiff had the Credit Builder loan reported by the credit reporting agencies and it negatively impacted Plaintiff's borrowing power and credit worthiness. These credit reports caused a substantial reduction to Plaintiff's credit score. Through their reporting of these void loans, Defendants dampened Plaintiff's credit score and/or purchasing power.

179.    Because of Plaintiff's indebtedness and credit reporting, SSG Burkhardt is currently in jeopardy of losing his security clearance and being involuntarily separated from the Armed Forces. Plaintiff and SSG Burkhardt are very concerned that the unpaid loans and excessive debt will result in the loss of SSG Burkhardt's security clearance and result in his termination from the military.

180.    Plaintiff's dampened credit score and the debt related to her loans causes her and SSG Burkhardt stress, anxiety, embarrassment, annoyance and lost credit opportunities.

181.    The amount of this debt, and any subsequent default, increases the risk that SSG Burkhardt's security clearance will be negatively impacted.

182.    The amount of this debt, and any subsequent default, will likely negatively impact SSG Burkhardt's military readiness.

183.    The amount of this debt, and any subsequent default, will likely negatively impact SSG Burkhardt's financial readiness.

184.    The amount of this debt, and any subsequent default, could cause SSG Burkhardt to be involuntarily separated from the military.

185.    The Plaintiff's loan Agreements with Defendants required them to pay $1,155.54 over 12 months, in addition to the $19.99 monthly fee, which required Plaintiff to pay $1,395.42 in total. The APR is more than 66%.

186.    The loan Agreements for the Credit Builder loans required Plaintiff to pay interest as defined by the MLA and required her to make regular monthly payments.

**VIII.    Why Predatory Lending Devastates Military Families Like the Burkhardts**

**A.    Constant Deployment and Training Disrupt Household Stability**

187.    SSG Burkhardt's military duties require relentless travel and extended absences, including at least two to four trainings per year, each lasting two to four weeks across multiple states including Virginia, Florida, Mississippi, Arizona, Texas and Georgia from 2022 through 2025.

188.    These recurring assignments create ongoing instability for the SSG Burkhardt and his dependents, including Plaintiff: unexpected travel expenses, temporary housing and gaps in pay that strain every aspect of household finances.

189.    During these absences, SSG Burkhardt's wife, Plaintiff Deven Burkhardt, manages the entire household alone making critical financial decisions without real-time communication or support.

**B.    Military Dependents Shoulder the Entire Financial Burden**

190.    Because of SSG Burkhardt's unpredictable schedule and communication restrictions, Plaintiff serves as the financial and logistical backbone of her family.

191.    She is responsible for repairs, pets, bills, moving and the family's overall financial health, often while juggling relocation and the uncertainty of military life.

192.    SSG Burkhardt's security clearance prevents him from using a cell phone during work, leaving Plaintiff unable to reach him during critical moments.

193.    When crises arise—such as delayed paychecks during a government shutdown—Plaintiff must keep the family afloat alone, often turning to lenders promising "instant cash" or "no-strings" advances.

**C.    Predatory Lenders Exploit Military Predictability Gaps**

194.    Predatory lenders like Defendants thrive on the instability that defines military family life. They market "quick fixes" or instant loans or "free cash" advances to military families desperate to bridge short-term gaps.

195.    But those "fixes" come with annual percentage rates of 495%, 990% or even 2,310%, turning a moment of need into a trap of perpetual debt.

196.    Military pay schedules and limited communication windows mean families like Plaintiff's can't easily negotiate or adjust payments, leaving them cornered by auto-deductions to their bank accounts and ballooning balances.

197.    What begins as a small loan to cover gas, groceries or pet care quickly becomes a financial chokehold that drains every paycheck for military families like Plaintiff's.

**D.    Debt Traps Threaten Careers and National Security**

198.    For servicemembers like SSG Burkhardt, debt is more than a private hardship, it is a career-threatening liability.

199.    Excessive debt is one of the leading causes of security clearance suspension or revocation, viewed by the DoD as a vulnerability to coercion or compromise.

200.    When predatory lenders trap families in spirals of finance charges, late payments, overdrafts and leech off their bank accounts, they don't just endanger the military household, they endanger a soldier's career and mission readiness.

201.    In this way, predatory lending is not merely unethical; it directly undermines military stability and national defense.

**E.    Emotional and Operational Strain on the Home Front**

202.    While SSG Burkhardt trains and deploys, Plaintiff bears the full emotional and logistical weight of running a household under pressure.

203.    Each new training cycle or relocation brings another round of unplanned costs, late fees and interest, all compounding into financial exhaustion.

204.    This relentless stress erodes not only credit but trust, morale, and family well-being, leaving military spouses like Plaintiff isolated and overwhelmed.

205.    Predatory lending feeds on that exhaustion: it hunts the strong, turning resilience into vulnerability and financial discipline into dependency.

206.    Predatory lending is uniquely destructive for military families because it weaponizes their discipline, duty and separation against them.

207.    Families like the Plaintiff's are pillars of stability amid chaos and yet lenders exploit their trust, their service, and their silence.

208.    What's marketed as "financial empowerment" is in truth a slow bleed of control, credit, and dignity. A system that punishes the very families who sacrifice most for the nation's security.

## CLASS ALLEGATIONS

209.    Plaintiff brings this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

210.    The proposed "MLA Class" is a nationwide class to be represented by the Plaintiff and is defined as:

> All active duty servicemembers and/or their dependents who obtained an Instacash loan or Credit Builder loan from Defendants within the applicable statute of limitations until the date notice is disseminated.

211.    Expressly excluded from the Class[6] are: (a) any Judge presiding over this action and members of their immediate families; (b) Defendants and any entity in which Defendants have a controlling interest, or which has a controlling interest in Defendants, and their legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

212.    The Class Period ("Class Period") is  within the applicable statute of limitations until the date notice is disseminated.

213.    Plaintiff reserves the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

---

[6] The MLA Class is referred to herein as the "Class."

214.    <u>Numerosity</u>. Because Defendants target military consumers as set forth herein, and because Defendants collectively extended millions of dollars to approximately 18 million people,[7] Plaintiff believes that there are at least 100 Class members. Joinder of this many Class members would be impracticable. The exact number of Class members is unknown, as such information is in the exclusive control of Defendants. However, the number of Class members can be easily determined through Defendants' business records. Specifically, this can be determined by obtaining a list of persons who obtained a loan extended by Defendants during the Class Period and running those names through the DoD's MLA database created to verify covered members and their dependents. Upon information and belief, Defendants maintain the information electronically that is required to generate such a list necessary to identify the members of the Class.

215.    <u>Commonality</u>. Common questions of law and fact affect the rights of each Class member and common relief by way of damages is sought for Plaintiff and Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

a.    Whether Defendants entered into standard-form agreements with servicemembers and their dependents;

b.    Whether Defendants' Instacash and Credit Builder loans are an extension of consumer credit under the MLA;

c.    Whether Defendants' Instacash and Credit Builder loans are an extension of consumer credit under TILA;

---

[7] https://www.moneylion.com/ (last visited May 22, 2025).

d.      Whether Defendants violated 10 U.S.C. § 987 of the MLA by extending loans to covered members and their dependents like Plaintiff and requiring that they pay interest that exceeded the statutory rate cap of 36% MAPR;

e.      Whether Defendants' standard form agreements failed to include required mandatory MLA written disclosures in violation of 10 U.S.C. § 987(c).

f.      Whether Defendants' standard form agreements extended to Plaintiff and the Class contain mandatory binding arbitration clauses in violation of 10 U.S.C. § 987(e)(3)

g.      Whether Defendants' standard form agreements extended to Plaintiff and the Class contain a class action waiver in violation of 10 U.S.C. § 987(e)(2)

h.      Whether Defendants' standard form agreements extended to Plaintiff and the Class contain a jury trial waiver in violation of 10 U.S.C. § 987(e)(2)

i.      Whether Defendants violated 10 U.S.C. § 987(e)(5) of the MLA by requiring that Plaintiff and the Class provide their bank account as security for the obligation in Defendants' Instacash loans that exceed 36% MAPR;

j.      Whether Defendants' standard form agreements extended to Plaintiff and the Class are void from inception as a result of the MLA violations; and

k.      The remedies and damages to which Plaintiff and the Class are entitled under 10 U.S.C. § 987(f)(5).

216.    <u>Typicality</u>. The claims and defenses of the representative Plaintiff are typical of the claims and defenses of the Class because she is a covered member and dependent under the MLA like the rest of the Class and her claims arise under the same legal theories and out of a common course of conduct. Plaintiff obtained the same Instacash and Credit Builder loan products as the Class members. These loan products uniformly require the payment of interest that exceeds 36%

MAPR, and uniformly require Plaintiff and the Class to provide their bank accounts as security for the obligation of the Instacash loans, both of which are prohibited by the MLA. As a result, these loans are void from inception, and Plaintiff suffered statutory and actual damages of the same type and in the same manner as the Class she seeks to represent. There is nothing peculiar about Plaintiff's claims when compared to those of the other members of the Class.

217. <u>Adequacy</u>. Plaintiff will fairly and adequately assert and protect the interests of the Class. As a dependent of an active duty military service member, Plaintiff is a "covered member" or "dependent" as defined under section 987(i)(1)(2) of the MLA. Plaintiff has no conflict of interest with the Class members she seeks to represent. She has hired attorneys who likewise have no conflicts of interest with the Class and who are experienced in prosecuting class actions, consumer protection law claims and MLA claims in particular, and will adequately represent the interests of the Class.

218. <u>Predominance and Superiority</u>. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons:

a. The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. The statutory claims under the MLA require a simple identification of those consumers who were also covered members and/or dependents at the time of their transaction, which can be accomplished by using the Defendants' business records and cross-checking the MLA database maintained by the DoD;

b. Prosecution of separate actions by each individual member of the Class would create a risk of inconsistent and varying adjudications against Defendants;

c.     Most covered members and/or dependents are unaware that their loans are void under the MLA and/or TILA;

d.     Adjudication with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudication or substantially impair their ability to protect their interests;

e.     Defendants extended hundreds of loans in this District and violated the MLA hundreds of times within this District, making this Court appropriate for the litigation of the claims of the entire Class;

f.     There are very few attorneys in the United States with any expertise or experience in this nascent area of law making it nearly impossible for Class members to find adequate representation; and

g.     The novelty of these claims and the fact that individual damages may be modest in comparison to the time required to litigate the case make a class action the only viable procedural method of redress in which Class members can, as a practical matter, recover for the conduct at issue. In fact, the vast majority of Class members are not even aware that they have a claim.

219.    Defendants acted and refused to act on grounds generally applicable to the Class, thereby making declaratory relief and corresponding final injunctive relief under Rule 23(b)(2) appropriate with respect to the Class as a whole.

220.    The MLA explicitly states that a creditor "may not impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a covered member or a dependent of a covered member." 10 U.S.C. § 987(b).

221.    The MLA explicitly states that "with respect to any extension of consumer credit (including any consumer credit originated or extended through the internet) to a covered member or a dependent of a covered member, a creditor shall provide to the member or the dependent the following information orally and in writing before the issuance of the credit: (A) a statement of the annual percentage rate of interest applicable to the extension of credit; (B) any disclosures required under the Truth in Lending Act (15 U.S.C. §§ 1601, *et seq*.); (C) a clear description of the payment obligations of the member or dependent, as applicable." 10 U.S.C. § 987(c).

222.    The MLA explicitly states that it "shall be unlawful for any creditor to extend consumer credit to a covered member or dependent of such a member with respect to which . . . the borrower is required to waive the borrower's right to legal recourse under any otherwise applicable provision of State or Federal law, including any provision of the Servicemembers Civil Relief Act (50 U.S.C. § § 3901, *et seq*.). 10 U.S.C. § 987(e)(2).

223.    The MLA explicitly states that it "shall be unlawful for any creditor to extend consumer credit to a covered member or dependent of such a member with respect to which . . .the creditor requires the borrower to submit to arbitration or imposes onerous legal notice provisions in the case of a dispute." 10 U.S.C. § 987(e)(3).

224.    The MLA explicitly states that it "shall be unlawful for any creditor to extend consumer credit to a covered member or dependent of such a member with respect to which . . . the creditor uses a check or other method of access to a deposit, savings, or other financial account maintained by the borrower, or the title of a vehicle as security for the obligation." 10 U.S.C. § 987(e)(5).

225.    Additionally, Defendants' loan terms are standardized for each proposed Class, meaning that all Class members were subjected to the same unlawful terms and suffered the same

types of harm arising from materially identical agreements. The MLA's protections are not contingent on individual reliance, but on whether the creditor imposed prohibited terms. Because Defendants' MLA violations are uniform, the Class mechanism is the only practical way to vindicate servicemembers' rights.

226.    Plaintiff and the Class are entitled to a declaration that their Agreements are void, and Defendants should be enjoined from attempting to collect any monies pursuant to them or to enforce them in any way.

**<u>COUNT I</u>**

**VIOLATIONS OF THE MILITARY LENDING ACT**
**10 U.S.C. §§ 987, *et seq*.**
***By Plaintiff, Individually, and on Behalf of the Class***

227.    Plaintiff and the Class repeat and re-allege the allegations contained in paragraphs 1 through 226 as if set forth herein in full.

228.    SSG Johnathan Burkhardt was serving as an active-duty member of the United States Armed Forces at the time that Plaintiff entered into the loan Agreements with Defendants, and on the date that the Instacash loans and Credit Builder loans were extended by Defendants.

229.    SSG Burkhardt and his wife, Plaintiff, were "covered borrowers," "covered members" and "dependents" as those terms are defined by 32 C.F.R. § 232.3(g).

230.    Members of the putative Class are also those individuals who were active duty servicemembers and/or their spouses on the date they received their Instacash loans and Credit Builder loans extended by Defendants.

231.    Each loan extended by Defendants to Plaintiff and the Class were for personal, family or household purposes and contain a "finance charge" and/or were payable by written agreement in more than four installments.

232.     Each Defendant is a "creditor" that provided "consumer credit" to Plaintiff and the Class as those terms are defined in 32 C.F.R. §§ 232.3(f), (h) & (i).

233.     Consumers are routinely and automatically debited for repayment. Failure to repay results in loss of platform privileges, credit degradation, or escalated collection activity, rendering the advance a de facto credit transaction under both the MLA and TILA.

234.     The MLA § 987(a) states that creditors, like Defendants, "shall not require the member or dependent to pay interest with respect to the extension of such credit" that contains terms prohibited by the MLA. 10 U.S.C. § 987(a). The MLA defines "interest" to include:

> all cost elements associated with the extension of credit, including fees, service charges, renewal charges, credit insurance premiums, any ancillary product sold with any extension of credit to a servicemember or servicemember's dependent, as applicable, and any other charge or premium with respect to the extension of consumer credit.

10 U.S.C. § 987(i)(3).

## I.    Interest Rate Cap Violations and Security Interest Violations

235.     Defendants' Instacash and Credit Builder loans both exceed the MLA's interest rate cap, and Defendants' Instacash loans violate the MLA's security interest prohibitions.

236.     Sections 987(b) and (e)(5) of the MLA prohibit interest rates that exceed 36% MAPR and also prohibit the requirement that a consumer provide their bank account as security for the obligation of a loan that exceeds 36% MAPR in extensions of consumer credit by creditors, like Defendants, to covered borrowers, like Plaintiff. 10 U.S.C. § § 987(b) and (e)(5):

> (b) A creditor described in subsection (a) may not impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a covered member or a dependent of a covered member;
>
> (e) It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which—

(5) the creditor uses a check or other method of access to a deposit, savings, or other financial account maintained by the borrower, or the title of a vehicle as security for the obligation.

237.    Thus, Defendants violate MLA § 987(a) by requiring covered borrowers to pay interest on their loans, which contain prohibited interest rates and for the Instacash loans that require covered borrowers to provide their bank account as security of the obligation for a loan that exceeds 36% MAPR.

**II.    <u>MAPR Violations</u>**

238.    The MLA prohibits "interest" above a 36% MAPR. 10 U.S.C. § 987(b).

239.    As explained herein, the charges Plaintiff and the Class paid in connection with their Instacash and Credit Builder loans increased the costs of those loans and therefore are "interest" under the MLA.

240.    Those charges also violate the MLA because they uniformly exceeded the MLA's 36% MAPR.

241.    Plaintiff and all Class members who were required to and did pay interest on their Instacash loans and Credit Builder loans with Defendants were damaged as a result of the unlawful extension of consumer credit in violation of 10 U.S.C. § 987(a).

242.    Further, MLA § 987(e) makes it a separate MLA violation for Defendants to extend consumer credit to Plaintiff and the Class through the use of standard form loan agreements, which all contain interest rates and/or terms which require the covered member and/or their dependent to provide their bank account as security for the obligation in the loan.

### III.    Security Interest Violations

243.    The MLA prohibits creditors from requiring that covered members and their dependents provide their bank account as security for the obligation when a loan exceeds the statutory rate cap of 36% MAPR. 10 U.S.C. § 987(e)(5) and 32 C.F.R. § 232(8).

244.    Defendants' standard-form agreements for the Instacash loans include security interest provisions with no exception for covered borrowers under the MLA, including the agreements entered into with Plaintiff that exceed 36% MAPR.

245.    As a result of unlawfully requiring covered borrowers like Plaintiff and the Class to enter into loans which require them to provide their bank account as security for a loan obligation that exceeds 36% MAPR in violation of 10 U.S.C. § 987(e)(5) of the MLA, the Instacash and Credit Builder loans that Defendants extended to Plaintiff and the Class are "void from inception" pursuant to 10 U.S.C. § 987(f)(3) and 32 CFR § 232.9(c).

246.    This is the same type of concrete harm that Congress sought to prevent when it implemented the MLA.

### IV.    MLA Disclosure Violations

247.    10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 make mandatory the following disclosures in all extension of consumer credit to Covered Borrowers:

(a) Required information. With respect to any extension of consumer credit (including any consumer credit originated or extended through the internet) to a covered borrower, a creditor shall provide to the covered borrower the following information before or at the time the borrower becomes obligated on the transaction or establishes an account for the consumer credit:

(1) A statement of the MAPR applicable to the extension of consumer credit;

(2) Any disclosure required by Regulation Z, which shall be provided only in accordance with the requirements of Regulation Z that apply to that disclosure; and

(3) A clear description of the payment obligation of the covered borrower, as applicable. A payment schedule (in the case of closed-end credit) or account-opening disclosure (in the case of open-end credit) provided pursuant to paragraph (a)(2) of this section satisfies this requirement.

[….]

(c) Statement of the MAPR—

(1) In general. A creditor may satisfy the requirement of paragraph (a)(1) of this section by describing the charges the creditor may impose, in accordance with this part and subject to the terms and conditions of the agreement, relating to the consumer credit to calculate the MAPR. Paragraph (a)(1) of this section shall not be construed as requiring a creditor to describe the MAPR as a numerical value or to describe the total dollar amount of all charges in the MAPR that apply to the extension of consumer credit.

(2) Method of providing a statement regarding the MAPR. A creditor may include a statement of the MAPR applicable to the consumer credit in the agreement with the covered borrower involving the consumer credit transaction. Paragraph (a)(1) of this section shall not be construed as requiring a creditor to include a statement of the MAPR applicable to an extension of consumer credit in any advertisement relating to the credit.

(3) Model statement. A statement substantially similar to the following statement may be used for the purpose of paragraph (a)(1) of this section: "Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: The costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account)."

248.    Defendants' standard form Agreements to Plaintiff and the Class do not contain any "Statement of MAPR" either in the form of the charges necessary to calculate the MAPR or through the inclusion of the MLA Model Statement.

249.    Within five (5) years of the original filing date of this case, Defendants violated the MLA and its implementing regulations by extending consumer credit without any MLA disclosures in violation of 10 U.S.C. § 987(c); 32 C.F.R. §§ 232.6(a) and (c).

250.    Defendants extended Plaintiff's loans through standard form Agreements which were utilized for all Class members, all of which failed to contain any MLA disclosures.

251.    Plaintiff was not aware that the MLA applied to her loans because she did not receive any MLA disclosures. Had Plaintiff been made aware of the MLA and its limits she would not have entered into the Defendants' loans.

252.    As a result of Defendants' failure to provide mandatory MLA disclosures as required by 10 U.S.C. § 987(c), Defendants violated the MLA and Plaintiff and Class members suffered actual damages.

## V.    Class Action Ban and Waiver of Jury Trial Violations

253.    10 U.S.C. § 987(e)(2) of the MLA prohibits creditors from requiring covered borrowers to "waive the borrower's rights to legal recourse under any otherwise applicable provision of State or Federal law."

254.    All of Defendants' standard form agreements require a covered borrower to waive their right to participate in a class action.

255.    Additionally, all of Defendants' standard form agreements require a covered borrower to waive their right to participate in a jury trial.

256.    Upon information and belief, all of Defendants' standard form agreements required Class members to waive their rights to participate or bring a class action or waive their rights to a jury trial.

257.    The right to participate in a class action and jury trial stem from the Rules of Civil Procedure under both State and Federal law, including the right to bring this class action under the MLA.

258.     As a result of unlawfully requiring covered borrowers to waive their rights to file or participate in any class action lawsuit or jury trial in violation of 10 U.S.C. § 987(e)(2) of the MLA, the Agreements of Plaintiff and all members of the Class are "void from inception" pursuant to 10 U.S.C. § 987(f)(3) and 32 C.F.R. § 232.9(c).

## VI.    Mandatory Binding Arbitration Clause Violations

259.     10 U.S.C. § 987(e)(3) of the MLA prohibits creditors like Defendants from requiring covered borrowers to submit to mandatory arbitration or onerous legal requirements.

260.     Defendants' standard form agreements require mandatory binding arbitration and onerous legal requirements, with no exceptions for covered borrowers under the MLA, including all of Defendants' Agreements entered into with Plaintiff.

261.     As a result of Defendants unlawfully requiring covered borrowers to enter into loan agreements that include mandatory binding arbitration and onerous legal requirements in violation of 10 U.S.C. § 987(e)(3) of the MLA, the Defendants' Agreements with Plaintiff and all Class members are "void from inception" pursuant to 10 U.S.C. § 987(f)(3) and 32 C.F.R. § 232.9(c) which results in no agreement ever having been formed.

## VII.    Remedies

262.     Defendants' MLA violations occurred when they charged interest on loans with MLA-violative interest rates and for Instacash loans that required Plaintiff and the Class to provide their bank accounts as security for the obligation in a loan that exceeds 36% MAPR. As a result, the loans that Defendants extended to Plaintiff and the Class are void as a matter of law.

263.     Defendants required Plaintiff to pay interest on Defendants' void loan agreements.

264.     Plaintiff paid interest on Defendants' void loan agreements.

265.     Each of Defendants' MLA violations are separate and independent under the MLA.

266.    Each time that Plaintiff paid money on Defendants' void loans constitutes a separate and independent violation under the MLA and damages caused by Defendants' unlawful MLA conduct.

267.    Each and every time that Defendants assessed interest on their void loans to Plaintiff and the Class restarts the statute of limitations under the MLA.

268.    The remedy to cure Defendants' violations of the MLA is voiding the loans of Plaintiff and the Class "from inception," pursuant to 10 U.S.C. § 987(f)(3) and 32 C.F.R. § 232.9(c).

269.    10 U.S.C. § 987(f)(5) and 32 C.F.R. § 232.9(e)(1) further provide that Plaintiff and each member of the Class are entitled to actual damage sustained but not less than $500.00 for each separate violation of the MLA, plus appropriate punitive damages, injunctive or declaratory relief and any other available relief.

270.    The Defendants are also liable for Plaintiff's attorneys' fees and costs pursuant to 32 C.F.R. § 232.9(e)(2) and 10 U.S.C. § 987(f)(5)(B).

### COUNT II

**VIOLATION OF THE TRUTH IN LENDING ACT**
**15 U.S.C. §§ 1601, *et seq*.**
**By Plaintiff, Individually, and on behalf of the Class**

271.    Plaintiff and the Class repeat and re-allege the allegations contained in paragraphs 1 through 226 as if set forth herein in full.

272.    Through their Instacash loans, Defendants extend credit to borrowers, and borrowers, in return, are required to authorize Defendants to debit their bank accounts on payday, in an amount equal to the credit extended and any "Turbo Fees" or "Tips" charged to the borrower.

273.    Through their Credit Builder loans, Defendants extend credit to borrowers and require them to pay "Monthly Membership Fees," and consumers repay the Credit Builder loan in monthly installments.

274.    These transactions are "credit" under TILA, as Defendants grant consumers the right to defer payment of debt or incur debt and defer its payment. 15 U.S.C. § 1602(f). Plaintiff incurred debt for InstaCash and Credit Builder loans, the repayment of which was deferred under the terms of the repayment Agreements.

275.    The charges that Defendants impose as an incident to its loans—"Turbo Fees," "Tips" and "Monthly Membership Fees"—qualify as "Finance Charges" because those charges have a close connection to the extension of credit. *Id.* § 1605(a).

276.    The 'tip,' 'membership fee,' and 'expedite fee' are functionally required for loan access. Absent payment, Plaintiffs either could not access funds or experienced material delay, making such charges a condition of credit.

277.    Because Defendants' Instacash and Credit Builder loans are "credit," and because Defendants impose "finance charges" in connection with those credit transactions, Defendants are "creditors," Plaintiff's and the Class's loans are "consumer credit transactions," and Plaintiff, Defendants and the Class members are "persons" within the meaning of TILA. *Id.* §§ 1602(e), (g), (i); *id.* § 1638(a).

278.    TILA requires "creditors," like Defendants, to disclose, among other things, the "finance charge" and "annual percentage rate" (if the finance charge exceeds certain amounts). *Id.* §§ 1638(a)(2), (3), (4), (5).

279.    For Instacash loans, Defendants do not disclose the "finance charge" or "annual percentage rate."

280.    For the Credit Builder loans, Defendants fail to accurately disclose the "finance charge" or "annual percentage rate."

281.    As a result of Defendants' refusal to comply with TILA and their systematic violation of the various disclosures required in each of their numerous cash advance transactions, Defendants are liable to Plaintiff and Class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. 15 U.S.C. §§ 1640(a), (e).

## REQUESTED RELIEF

Plaintiff respectfully requests that this Court enter order and judgment as follows:

A.    An order certifying this action to proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class Representative, and appointing the undersigned as Class Counsel;

B.    A judgment declaring Plaintiff's and the Class members' loans void from inception because they violate the MLA and awarding Plaintiff and the Class the equitable, declaratory and injunctive relief set forth in 10 U.S.C. § 987;

C.    A judgment awarding Plaintiff and Class members actual damages paid in connection with or pursuant to the illegal and void loans not less than $500.00 per MLA violation, together with appropriate punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A);

D.    A judgement awarding Plaintiff and Class members all of the damages allowed by 15 U.S.C. § 1640.

E.    A judgment awarding Plaintiff and the Class reasonable attorneys' fees and costs incurred in this action pursuant to 10 U.S.C. § 987(f)(5)(B) and 15 U.S.C. § 1640;

F.      A judgment awarding Plaintiff and the Class all pre-judgment and post-judgment interest recoverable at law or in equity; and

G.      A judgment awarding Plaintiff and the Class such other and further relief to which they are justly entitled.

## JURY TRIAL DEMAND

Plaintiff and the Class demand a jury trial on all issues so triable.

Date: October 17, 2025                         Respectfully submitted,

**PEARSON WARSHAW, LLP**

*/s/ Melissa S. Weiner*
Melissa S. Weiner (NY Bar No. 5547948)
Ryan T. Gott*
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
mweiner@pwfirm.com
rgott@pwfirm.com

**VARNELL & WARWICK, P.A.**
Janet R. Varnell*
Florida Bar No.: 0071072
Brian W. Warwick**
Florida Bar No.: 0605573
Christopher J. Brochu**
Florida Bar No: 1013897
400 N. Ashley Drive, Suite 1900
Tampa, Florida 33602
Telephone: (352) 753-8600
Facsimile: (352-504-3301
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
cbrochu@vandwlaw.com
jnewsome@vandwlaw.com
plevinson@vandwlaw.com

ckoerner@vandwlaw.com
jesquibel@vandwlaw.com
emcgowan@vandwlaw.com
service@vandwlaw.com

**EAST END TRIAL GROUP LLC**
Kevin Abramowicz*
Kevin Tucker*
Chandler Steiger*
Jessica Liu*
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208
Telephone: (412) 223-5740
Facsimile: (412) 626-7101
kabramowicz@eastendtrialgroup.com
ktucker@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
jliu@eastendtrialgroup.com

**NATIONAL CONSUMER LAW CENTER**
Shennan Kavanagh (MA BBO # 655174)*
Jennifer Wagner (Reg. No. 6083463)**
7 Winthrop Square, 4th Floor
Boston, MA 02110
Telephone: (617) 542-8010
Facsimile: (617) 542-8028
skavanagh@nclc.org
jwagner@nclc.org

*Pro Hac Vice Application Forthcoming
** SDNY Admission Forthcoming

*Counsel for Plaintiff and the Proposed Class*